UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THORIUM CYBER SECURITY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> JAMES DOUGLAS NURMI, <br><br> Defendant. | Case No. 3:19-cv-07669-WHO <br><br> **ORDER ON MOTION TO DISMISS; MOTION TO STRIKE** <br><br> Re: Dkt. No. 55 |

Plaintiff Thorium Cyber Security, LLC ("Thorium"), sued defendant James Douglas Nurmi for allegedly accessing and misusing its online accounts and intellectual property without authorization. Nurmi now brings five counterclaims. Before me is Thorium's motion to dismiss four of them. That motion is granted with leave to amend. Because three of the counterclaims are only against Thorium's CEO, John Bailey, they are not proper counterclaims. Nurmi's only argument to the contrary is that Thorium and Bailey should be treated as alter egos. That argument fails because Nurmi has not shown, as required, that the alter ego doctrine is necessary to avoid inequity. The remaining counterclaim alleges that Nurmi was fraudulently induced into investing in Thorium. I lack jurisdiction over that counterclaim because it arises from entirely different operative facts than Thorium's computer access claims. I also grant Thorium's motion to strike Nurmi's affirmative defenses.

## BACKGROUND

### I.     PROCEDURAL HISTORY

In November 2019, Bailey filed a pro se complaint against Nurmi. Complaint ("Compl.") [Dkt. No. 1]. He also moved for a temporary restraining order ("TRO"). Dkt. No. 2. Bailey is the co-founder and CEO of Thorium. *See* Compl. ¶ 1. He alleged that he hired Nurmi to work for

1  Thorium in June 2018 and that Nurmi was later made chief technology officer. *Id.* ¶ 3. The
2  Complaint claimed that Bailey dismissed Nurmi in July 2019 because of dishonesty about a legal
3  issue, struggles with substance abuse, and failures to adequately perform his job. *Id.* Exs. A, E.
4  Bailey requested a TRO because, he claimed, Nurmi allowed Thorium's domain names to expire,
5  took control of them, and locked Bailey out. *Id.* ¶¶ 3–4, 8–9, Ex. I. Nurmi communicated to
6  Bailey that he had sold Thorium's intellectual property and ended operations of the company in
7  the European Union. *Id.* ¶ 9, Ex. I. Bailey also alleged that Nurmi had incorporated a fake
8  company—called "Ambitrace, Inc.," the name of Thorium's flagship product—using Bailey's
9  forged signature. *See id.* ¶ 6, Exs. E, F.

Days after he moved for a TRO, I ordered Bailey to attempt service on Nurmi and provide Nurmi and his attorney with copies of his TRO motion. *See* Dkt. No. 8. Nurmi, according Bailey, resided in Luxembourg. Bailey represented that he sent summonses to Nurmi's addresses in San Francisco and Luxembourg, contacted Nurmi's attorneys (who were no longer representing him), and sent the relevant documents to email addresses associated with Nurmi and to Nurmi on the messaging application Signal. *See* Dkt. No. 12 at 3.

Nurmi did not appear at the hearing I set on the TRO. *Id.* at 4. I granted the TRO enjoining Nurmi from "accessing, manipulating, altering, or destroying the source code or other confidential information he has allegedly stolen from Thorium's online accounts." *Id.* at 1. Bailey had presented evidence that he and other Thorium employees could not access the company's online accounts, which contained confidential intellectual property. *Id* at 4. He presented evidence that Nurmi's intent was to use Thorium's code for himself. *Id.* I found that this constituted a threat of irreparable injury in the form of harm to Thorium's business and loss of customers and goodwill. *Id.* at 4–5. Bailey had raised serious questions going to the merits and the balance of equities and public interest favored a TRO. *Id.* at 5. I also stated that Bailey could not obtain more than temporary relief without affecting service under the Hague Convention. *Id.*

On January 7, 2020, I extended the TRO. *See* Dkt. No. 18. Bailey had filed proof that proper service was under way. *Id.* at 1. Although a certificate of service had not been filed, I explained that "in the face of the harms described in my prior Order, the complexity and time it

takes to effect service in accordance with the requirements of the Hague Convention, and the steps Bailey has taken to provide notice to Nurmi, I find it appropriate to extend the effect of the TRO until such time as service has been completed." *Id.* at 1–2. I noted that Nurmi may move "at any time" to expunge the TRO and I would schedule an expedited hearing. *Id.* at 2. I also denied Bailey's motion for summary judgment without prejudice as premature. *Id.* at 1. I later referred the matter for appointment of pro bono counsel. Dkt. No. 21.

On April 9, 2020, Nurmi (represented by counsel) moved to dismiss the Complaint. *See* Dkt. No. 29. Nurmi argued that "Thorium (not Bailey) is the entity that owns the intellectual property at issue in this case and, thus, the real party in interest" and that Bailey had no standing. *Id.* 3. In an order on the hearing for that motion, I noted that it "appears that Thorium Cybersecurity, LLC, not pro se plaintiff John Bailey, is the real party in interest with respect to the allegations in the complaint" and that Bailey would need counsel to substitute Thorium as the plaintiff. *See* Dkt. No. 33 (citing *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02 (1993)). The law firm Jones Day appeared as counsel for Thorium (and Bailey, to the extent he is involved now as a putative counter-defendant) and Thorium was substituted as the plaintiff in the First Amended Complaint ("FAC") [Dkt. No. 44]. *See* Dkt. No. 37. The FAC was filed on September 4, 2020, and Nurmi filed his Answer on October 8, 2020.

## II. FACTUAL ALLEGATIONS

Because this case is before me on a motion to dismiss counterclaims and strike defenses, the allegations here are drawn from the Answer and Counterclaims[1] [Dkt. No. 46] unless otherwise noted. Many of Nurmi's counterclaims are centered on his allegation that Thorium is Bailey's "alter ego . . . and vice versa." Counterclaims ¶ 5. He alleges that Bailey controlled Thorium, commingled his funds and assets with Thorium's, used Thorium's funds and assets for his personal use, disregarded Thorium's corporate formalities, inadequately capitalized Thorium, and used the same address as his home and Thorium's business address. *Id.* ¶ 6.

Nurmi's counterclaims revolve around investments he made in Thorium and loans he made

---

[1] I refer to the answer and affirmative defenses (pages 2–15) as "Answer" and the counterclaims (pages 15–27) as "Counterclaims."

to Bailey. Nurmi alleges that he was hired in June 2018 and promoted to vice president of engineering in August 2018. *Id.* ¶ 16. In July 2018, he claims that he invested $8,000 in Thorium in exchange for equity interest in it. *Id.* ¶ 17. He also claims that Bailey asked him to make a $10,000 investment in August 2018. *Id.* ¶19. According to the Counterclaims, Nurmi asked for and Bailey provided financial information about the company. *Id.* ¶¶ 19–20. That information included the representation that, if Nurmi invested $10,000, he would own a twenty-eight percent interest in Thorium and become a "28% full partner." *Id.* ¶ 20. It also represented that Bailey owned a twenty-eight percent interest in Thorium and that he was holding—"for legal reasons"—a twenty-eight percent interest for John Drago, one of the founders of Thorium. *Id.* & n.2. Bailey also allegedly represented that Thorium granted a man named Jonathan Lupo an equity interest as payment for design services. *Id.* Nurmi asserts that Bailey told him his investment would purchase back that equity and pay a debt owed for web design services to another person. *Id.* Nurmi invested the $10,000 on August 7, 2018. *Id.* ¶ 21. Nurmi alleges that Bailey diverted that money for his own personal use. *Id.* ¶ 22. He claims that he learned in July 2019 that Thorium had not repurchased Lupo's interest. *Id.* ¶ 36. He asserts that he learned in December 2019 that Thorium had not paid back the webpage debt. *Id.* ¶ 38. H also states that he personally paid off that debt instead. *Id.* Accordingly, Nurmi claims that he and Bailey "are and were at all relevant times herein co-owners of Thorium," but that Bailey possesses the majority interest in it. *Id.* ¶ 10.

Nurmi further claims that in September 2018, Bailey requested a loan of $12,000 "to keep Thorium financially afloat" in return for personally guaranteeing it. *Id.* ¶ 24. Nurmi made the loan, which he alleges has never been repaid. *Id.* He again alleges Bailey diverted that money for his own use. *Id.* ¶ 25.

In "Fall" 2018, Nurmi alleges that he and Bailey incorporated Ambitrace Inc. "to carry on Thorium's business ventures." *Id.* ¶ 26. The incorporation occurred in November 2018; Bailey was CEO, Nurmi was secretary and treasurer, and they had equal shares of stock. *Id.* ¶ 27. That month, Nurmi alleges he loaned Bailey $18,000 with a promise that it would be repaid. *Id.* ¶ 28. He claims Ambitrace Inc. purchased Thorium's intellectual property in exchange for stock in it. *Id.* ¶ 29.

4

1    In January 2019, Nurmi says he loaned Bailey another $15,000, for which they entered into
2    a promissory note that provided that 500,000 shares (one-quarter) of Bailey's Ambitrace Inc. stock
3    would pass to Nurmi upon default. *Id.* ¶ 30. They allegedly agreed that a repayment installment
4    plan would begin on July 1, 2019. *Id.* In summer 2019, Nurmi claims that he loaned Bailey
5    €6,000 for a trip to Luxembourg that they took. *Id.* ¶ 31. He also loaned him approximately
6    $2,500 for expenses on the trip. In May 2019, Nurmi asserts that he loaned Bailey $10,000 so that
7    Bailey could pay his property taxes. *Id.* ¶ 32. He claims that none of the loans has been repaid.

Bailey allegedly defaulted on the January 2019 promissory note by failing to make the first installment payment by July 1, 2019. *Id.* ¶ 33. Nurmi claims that he consequently became the majority shareholder of Ambitrace Inc. because 500,000 of Bailey's shares passed to him. Nurmi alleges that Bailey purported to terminate Nurmi's employment with Ambitrace Inc., despite not possessing the ability to do so. *Id.* ¶ 34. Nurmi alleges that his employment with Thorium was never terminated. *Id.* ¶ 35. He claims that Ambitrace Inc. sold its intellectual property assets to him in October 2019. *Id.* ¶ 37.

His counterclaims are for (1) declaratory judgment against Thorium for ownership rights to the companies and property, (2) fraud against Thorium and Bailey based on the representations made about the use of the August 2018 investment, (3) breach of contract against Bailey for the alleged five loan agreements that have not been repaid, (4) the enhanced civil remedy under Section 469 of the California Penal Code for receiving or withholding stolen property or obtaining property in a manner constituting theft against Bailey based on using Nurmi's investments in Thorium, (5) and breach of fiduciary duty against Bailey.

**LEGAL STANDARD**

**I.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

   **A. Generally**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). The party

invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal. *See Wolfe*, 392 F.3d at 362.

### B. Supplemental Jurisdiction

28 U.S.C. § 1367 governs the exercise of supplemental jurisdiction over state law claims in a suit involving federal claims. In general, when district courts have original jurisdiction over civil actions, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Subsection (c) lists four situations in which a district court may decline to exercise supplemental jurisdiction over state law claims:

1. The claim raises a novel or complex issue of state law,
2. The claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
3. The district court has dismissed all claims over which it has original jurisdiction, or
4. In exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

## II. MOTION TO STRIKE

FRCP 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues

by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation and alteration omitted). Motions to strike "are generally disfavored [by courts] because the motions may be used as delaying tactics and because of the strong policy favoring resolution on the merits." *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010) (citation omitted). Such motions should only be granted if "the matter has no logical connection to the controversy at issue *and* may prejudice one or more of the parties to the suit." *New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009). "Where the moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to strike even though the offending matter literally was within one or more of the categories set forth in Rule 12(f)." *Id.* (citation and quotation marks omitted).

In resolving a motion to strike, the pleadings must be viewed in the light most favorable to the nonmoving party. *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court." *Cruz v. Bank of New York Mellon*, No. 12-CV-00846-LHK, 2012 WL 2838957, at *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973).

**DISCUSSION**

**I.    SUFFICIENCY OF ALTER EGO ALLEGATIONS**

The parties' dispute about this motion spans several issues, but many of them turn on the same preliminary question: whether Nurmi has sufficiently pleaded that Thorium is an alter ego for Bailey.

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).[2] But, under the alter ego doctrine, courts will sometimes disregard the corporate form and "deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the

---

[2] The parties both apply California law to the alter-ego question. *See, e.g.*, Mot. 4–5; Oppo. 6.

1  equitable owners." *Id.*  The doctrine is equitable and meant to prevent using the corporate form to
2  "perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable
3  purpose." *Id.*  Under California law, there are two requirements to successfully invoke the alter
4  ego doctrine: "(1) that there be such unity of interest and ownership that the separate personalities
5  of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of
6  the corporation alone, an inequitable result will follow." *Automotriz Del Golfo De California S. A.*
7  *De C. V. v. Resnick*, 47 Cal. 2d 792, 796 (1957).

8  "The factors which may show the 'unity of interest' issue vary according to each case and
9  are fact specific." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285 n.13 (1994).
10 These factors have included whether the corporation was adequately capitalized, the extent to
11 which corporate formalities are observed, whether the assets of the individual and corporation are
12 commingled, whether the corporation is treated as a mere "corporate shell" for the individual, and
13 holding out one actor as liable for the other's debts.  *See id.*; *see also Sonora Diamond*, 83 Cal.
14 App. 4th at 538–39.  This list is non-exhaustive and no factor is determinative.  *Virtualmagic Asia,*
15 *Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228 (2002), *as modified on denial of reh'g* (June 10,
16 2002).

17 The second element is met when "adherence to the fiction of the separate existence of the
18 corporation would promote" a sufficient inequity or injustice.  *Misik v. D'Arco*, 197 Cal. App. 4th
19 1065, 1074 (2011), *as modified* (Aug. 9, 2011).  That inequitable or unjust result can include
20 "frustration of a meritorious claim, perpetuation of a fraud, and the fraudulent avoidance of
21 personal liability," but does not require pleading or proof of actual fraud.  *Updateme Inc. v. Axel*
22 *Springer SE*, No. 17-CV-05054-SI, 2018 WL 1184797, at *10 (N.D. Cal. Mar. 7, 2018).

23 Here, Nurmi has failed to show that respecting Thorium's separate corporate form would
24 lead to any injustice or inequity.  In his Opposition he offers two alleged inequities.  First, he
25 argues without elaboration that it would be inequitable "for Bailey to use Thorium as a sword to
26 litigate against Nurmi, and then as a shield to protect himself from Nurmi's claims." Oppo. 6.
27 But, as Nurmi has argued in this litigation, Bailey lacked standing to pursue claims on Thorium's
28 behalf; Thorium, as Nurmi himself urged, was substituted as the plaintiff.  It is entirely unclear

how Thorium is acting as a "shield" for Nurmi's claims against Bailey. Nurmi has identified no barrier created by Thorium's existence that would preclude him from pursuing his three claims against Bailey in an appropriate proceeding, including in state court. Nor has Nurmi explained why the fraud claim against Bailey and Thorium would be unjustly thwarted if the two were treated as separate entities. There is no indication, for instance, that Bailey has personally committed a wrongful act but cannot be held accountable in state court because of Thorium.

Second, Nurmi argues that it is inequitable "for Bailey to argue that Nurmi's counterclaims are not compulsory under Rule 13 in federal court, while reserving their ability to demur in state court based on compulsory counterclaim preclusion." Oppo. 6. Nurmi's concern on this front arises from Bailey and Thorium declining to waive their ability to object on this ground. *See, e.g.*, *id.* Ex. A [Dkt. No. 58-1] at ECF 4.

The theoretical possibility of asserting this preclusion argument is not sufficient inequity and it is not a sufficiently realistic threat. To start, Nurmi would have the benefit of my order today finding—as explained below—that he could not bring his claims against Bailey, including as compulsory counterclaims. It is also difficult to see how Bailey could argue in state court that Nurmi's claims were precluded on federal compulsory-counterclaim grounds in light of his arguments here that Nurmi has no compulsory counterclaims against him. *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782–83 (9th Cir. 2001) (discussing the conditions under which judicial estoppel prevents parties from taking inconsistent positions). And it is difficult to imagine a state court holding that Nurmi was able and required to pursue federal compulsory counterclaims when the federal court told him that he could not. Moreover, if Bailey did argue in state court—in contradiction of his argument here—that Nurmi could have brought compulsory counterclaims *because* Thorium is merely Bailey's alter ego, that is the sort of unjust avoidance of liability that the alter ego doctrine is built for. Nurmi would, at that point, presumably have more than sufficient grounds to seek leave to refile his alter ego-based claims here.[3]

---

[3] If Bailey or Thorium argued that Nurmi's suit were barred on any ground that did not depend on the alter ego doctrine, it would not be contrary to their representations about the doctrine here and would not be grounds to seek leave to refile the counterclaims.

9

Much of Nurmi's brief is focused on the inefficiency that he believes would result from litigating his claims against Bailey and Thorium in a different proceedings. The alter ego doctrine, however, does not exist to remedy inefficiency, it exists to remedy inequity. Nurmi has identified no inequity or injustice that would result from treating Bailey and Thorium as distinct entities. Because the alter ego doctrine does not apply for this reason, there is no need to address whether the two had a unity of interest.

## II. THIRD, FOURTH, AND FIFTH COUNTERCLAIMS

Counterclaims under FRCP 13 may only be brought against "opposing part[ies]." *See* Fed. R. Civ. P. 13(a)–(b). Thorium is the only plaintiff; Bailey is not a plaintiff and is not Nurmi's "opposing party." Nurmi's only argument that Bailey is nonetheless an "opposing party" is the alter ego doctrine.[4] Accordingly, Nurmi effectively concedes that if the alter ego doctrine does not apply, he has no claims that do not include Thorium. The third, fourth, and fifth counterclaims are only against Bailey, not Thorium. The motion to dismiss those counterclaims is GRANTED.[5] Because this is Nurmi's first attempt at pleading these counterclaims, dismissal is with leave to amend.

## III. SECOND COUNTERCLAIM

The inquiry is different when it comes to the second counterclaim (for fraud) because it is brought against both Thorium and Bailey. Rule 13(h) provides that, "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." FED. R. CIV. P. 13(h). The Rule permits nonparties to be added to counterclaims against opposing parties, so long as jurisdiction can be acquired over the nonparty and the requirements of Rule 19 or Rule 20 are otherwise met. *Id.*; *see also id.* 13(a)(1)(B).

### A. The Second Counterclaim is not Compulsory

Rule 13 contemplates two types of counterclaims: compulsory and permissive. In a

---

[4] Because I conclude that the alter ego doctrine does not apply, there is no need to address the seemingly unsettled question whether Rule 13 is satisfied when someone is not a *de jure* opposing party but is that party's alter ego.

[5] For clarity, I do not address whether I would have supplemental jurisdiction over these counterclaims because they are not appropriate counterclaims in the first place.

10

compulsory counterclaim, "A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." *Id.* 13(a)(1).  A permissive counterclaim is "a counterclaim against an opposing party any claim that is not compulsory." *Id.* 13(b).

To determine whether a counterclaim arises out of the same transaction or occurrence, the Ninth Circuit applies the "logical relationship test." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195–96 (9th Cir. 2005).  "A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *Id.* at 1196 (internal citations omitted).

The FAC alleges, in brief, that Nurmi unlawfully accessed and operated Thorium's online accounts and denied Thorium rightful access.  Nurmi's fraud counterclaim, on the other hand, alleges that Bailey induced Nurmi to invest $10,000 in Thorium in exchange for an equity interest in it.  *See* Counterclaims ¶ 48.  According to Nurmi, Bailey represented his investment would be used to purchase back Lupo's interest in Thorium and pay the debt owed on web design services. *Id.* ¶ 49.  Nurmi claims that, instead, the money was diverted for Bailey's personal use, not those business uses that were promised.  *Id.* ¶ 50.  Nurmi accordingly argues that he was induced to make the investment by intentional material misrepresentations.  In his Opposition, Nurmi contends that this fraud claim arises from the same transaction or occurrence as the FAC's allegations because "Bailey's failure to use those funds as advertised financially crippled Thorium and resulted in Nurmi acquiring ownership of the intellectual property and business accounts that Thorium now claims Nurmi unlawfully accessed." Oppo. 7.

I agree with Thorium that this alleged fraud does not "arise[] from the same aggregate set of operative facts as the initial claim." *Pegasus*, 394 F.3d at 1196.  What Nurmi leaves out from his argument that the allegedly fraudulent investment "resulted in" his alleged ownership is the

11

highly attenuated causal chain linking them. Nurmi alleges that his access of the online systems was rightful because *Ambitrace Inc.* sold him the intellectual property. Counterclaims ¶ 37. That sale had nothing to do with his investment in Thorium on (allegedly) false pretenses. And he alleges that he acquired the controlling interest in Ambitrace Inc. because of Bailey's default on a loan unrelated to the investment in this counterclaim. Even on Nurmi's theory, the chain of causation is: (1) he invested in Thorium, (2) the investment was not used for Thorium, (3) therefore, Thorium's business suffered, (4) as a result of the business suffering, Bailey and Nurmi chose to incorporate a new business, (5) Thorium's intellectual property was sold to the new business, and (6) that new business eventually sold the intellectual property—the subject of the FAC—to Nurmi, making his access rightful. Nurmi's use of the online accounts and intellectual property does not arise from the same operative facts as the alleged fraud. While they involve the same personalities, the FAC's allegations and the fraud counterclaim are legally unconnected.

### B. There is no Supplemental Jurisdiction over the Second Counterclaim

Thorium argues that, because the second counterclaim is not compulsory, I lack subject matter jurisdiction over it. Mot. 10–13. This action is predicated on federal question jurisdiction because the FAC alleges a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. *See* 28 U.S.C. § 1331. The federal supplemental jurisdiction statute provides for jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). When there is not an independent basis for jurisdiction over a permissive counterclaim, courts must possess supplemental jurisdiction over it. *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 210–11 (2d Cir. 2004); *Channell v. Citicorp Nat. Servs., Inc.*, 89 F.3d 379, 385–86 (7th Cir. 1996); *Woodrow v. Satake Family Tr.*, No. C 06-2155 WDB, 2006 WL 2092630, at *1–*2 (N.D. Cal. July 27, 2006).

To test whether claims are part of the same case or controversy under Article III and Section 1367, courts ask whether the state law claim shares a "common nucleus of operative fact" with the federal claim. *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004). As I explained above, the investment that the fraud allegation stems from has nothing to do with the

12

facts at the heart of the FAC's claims.  Whether Nurmi's alleged access and use of the online accounts and intellectual property was lawful does not depend (even on Nurmi's account) on the investment at all—and certainly does not depend on whether the investment was procured by fraud.

In *Otsuka v. Polo Ralph Lauren Corp.*, the plaintiff alleged various employment violations based on the defendant's allegedly unlawful employment rules and compensation practices.  No. C 07-02780 SI, 2008 WL 2037621, at *1 (N.D. Cal. May 12, 2008).  The defendant counterclaimed for breach of fiduciary duty and conspiracy to commit fraud because the plaintiff allegedly "entered fictitious customer names when selling products to a former Polo employee who was improperly using merchandise credits for her purchases" and using his employee discount to make purchases for an acquaintance.  *Id.*  The court found that there was no supplemental jurisdiction (and that the counterclaims were not compulsory) because there was no logical connection between the essential facts relating to the employment violations and the essential facts relating to the employee's alleged violations.  Here, as there, the parties do have a relationship—in this case, from employment, investments, and loans.  In both cases, the claims and counterclaims arise from that relationship.  But the facts of each claim have no other real connection.  If I had supplemental jurisdiction over Nurmi's fraud counterclaim, the "common nucleus of operative fact" test would be watered down to treat any claims between the same parties as one case or controversy.

Nurmi bears the burden of establishing subject matter jurisdiction and has pointed to no case in which such disconnected facts were found to be part of the same case or controversy.  Accordingly, the motion to dismiss Nurmi's second counterclaim is GRANTED.  The dismissal is with leave to amend.

### IV. AFFIRMATIVE DEFENSES

I will also grant Thorium's motion to strike Nurmi's affirmative defenses.  They are insufficiently pleaded because they fail to put Thorium on notice of the basic facts underlying them.  Nurmi's allegations regarding these affirmative defenses are conclusory legal allegations such as, "As an affirmative defense to the FAC and each cause of action and claim for relief alleged therein, Nurmi alleges that the FAC, and each alleged cause of action therein, is barred, in

13

its entirety, by the Doctrine of Unclean Hands." Answer ¶ 101. Nurmi need not provide all facts underlying his affirmative defenses but I and other judges in this district have concluded that "the *Twombly/Iqbal* standard properly applies to affirmative defenses." *BlackBerry Ltd. v. Typo Prod. LLC*, No. 14-CV-00023-WHO, 2014 WL 1867009, at *5 (N.D. Cal. May 8, 2014). Nurmi's pleading is a "boilerplate listing of affirmative defenses" that, as currently pleaded, lack a "valid basis." *Id.* At a minimum, Nurmi must allege sufficient facts to give Thorium notice of the grounds of these affirmative defenses.

Nurmi also includes two purported affirmative defenses that are improper. His first affirmative defense is "failure to state a cause of action." A 12(b)(6) defense is not an *affirmative* defense because it seeks to show a defect in the plaintiff's prima facie case. *See Zivkovic v. S. California Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense.").[6] And his eighteenth affirmative defense, labelled "Further Affirmative Defenses," purports to be a reservation of Nurmi's right to assert later additional defenses based on newly discovered facts. *See* Answer ¶ 115. That is an improper attempt to slide an unknown defense into a case rather than seeking court approval to amend once facts giving rise to the defense are known.

## CONCLUSION

The motion to dismiss counterclaims two, three, four, and five is GRANTED. The motion to strike is GRANTED. Both are with leave to amend. Any amended answer or counterclaims shall be filed by January 5, 2021.

**IT IS SO ORDERED.**

Dated: December 10, 2020

William H. Orrick
United States District Judge

---

[6] Nurmi misreads FRCP's Form 30 to argue that it is listed as an affirmative defense there; it is not.

14